Samuel C. Coleman, J.
This is an action in aid of an attachment (Civ. Prac. Act, § 943) brought by the Sheriff and the attaching plaintiff against a bank to reduce to possession a bank account on deposit with the bank in the name of the defendant in the attachment proceedings. The bank has declined to turn over the funds to the Sheriff on the ground that the account constitutes proceeds from a trust receipt transaction in which the defendant and its principal, a Swiss bank, were “ entrusters ”. The trust receipt transaction related to a shipment of coconut oil from abroad. The principal questions gone into on the trial were whether the oil had lost its identity through commingling with other shipments of oil, and whether the proceeds from the sale of the oil had been identified. But the plaintiff also urged that because of the defendant’s inaction with respect to the trust receipt transaction it has lost its special and privileged position in the oil and the proceeds from the sale and can claim no special rights in the bank account; that it had waived such rights. I agree with the plaintiff; and this conclusion makes it unnecessary to consider the questions of commingling and loss of identification. If a determination of that question were necessary, I would say that the defendant has failed to sustain the burden of proof in that respect; the commingling of fungible merchandise and the disposition of the proceeds making identification almost impossible.
The shipment from abroad was a large one. We have not been given the details of the financial arrangements between the Swiss bank and Primateria, the shipper, but on April 20, 1953 documents enabling Agro Products Corporation to obtain control of the oil were transmitted to Agro by the defendant, together with the trust receipt. The trust receipt stated that possession of the documents was entrusted to Agro as trustee “ to effect customs entry and prepare the merchandise for reshipment and effect payment of $385,805 to J. Henry Schroeder Banking Corp. * * * on or before May 19, 1953, or within one week after reshipment, whichever date first occurs ”. Other provisions emphasize the trust nature of the relation by requiring the trustee to keep the proceeds in trust and to maintain the trust property in such manner that it would be capable of identification, A proper statement of trust *503 receipt financing as required by statute was duly filed (Personal Property Law, § 58-e).
By May 19 there had been no reshipment, no sale by Agro and no payment. On that day, the defendant telephoned Agro, asked for payment and was told that an extension would be necessary; automatically an extension was granted to June 19 without inquiry on the bank’s part as to whether any of the oil had been sold or even reshipped. It will be observed that strictly Agro had no power to sell, only the power to prepare the oil for reshipment. Early in June, Agro proceeded to sell the oil and to make shipments of it. By June 11 there had been substantial sales for which Agro received payment. The proceeds thus received were deposited indiscriminately by Agro in its general bank accounts, together with the proceeds of the sale of other coconut oil entrusted to it under similar documents by the defendant and by other banks, some of which had been stored in the same tanks in which the oil involved here had been placed. No payments were made to the defendant. On June 11 Agro asked for a second extension of one month’s time within which to pay and on June 16 an extension was granted until June 30. Again, the extension was asked for and granted almost automatically. There was no inquiry by the bank as to the status of the oil; no inquiry whether there had been any sales or reshipment or whether any proceeds had been received; and Agro said nothing. Between June 19 and June 30 the balance of the oil was sold and paid for, the proceeds being deposited in the manner I have already stated, in one bank account or another, without reference to the source of the proceeds. Indeed, all the oil had been sold and reshipped by June 16, before the first extension had expired. On June 22 Agro made its first and only payment to the bank, $100,805. This payment apparently was accepted without any inquiry as to the amount of oil sold, the date of sale or whether the payment was for all the oil already sold. On June 30, the bank asked for payment of the balance and was told by Agro that it had arranged with Primateria for an additional extension of two weeks’ time. The bank accepted this statement at its face without any inquiry as to the sales or the receipt or disposition of proceeds, and without inquiry whether the Swiss bank had even been consulted on the question of the extension; it merely transmitted to the Swiss bank what Agro told it. The testimony for the bank as to what occurred on June 30 was quite vague and, at best, indicated that the bank was asking for payment in a casual, routine manner, and that, in the same manner, it *504 acquiesced in the suggestion that there was or would be a further extension.
Meantime, on June 23, the day after the payment by Agro of the sum of $100,805, Agro did take some further action, which is said to relate to the oil. Primateria had had a bank account in the defendant bank and on June 23, Agro deposited $110,000 in that account for the benefit of Primateria. There were debits against the account and credits to it, and by July 17, the date of the Sheriff’s attachment, the account had been reduced to $12,504.06. It is the right to that deposit which is now in question. The attaching plaintiff asserts that the account is Primateria’s and that, as a creditor of Primateriá, it can obtain the aid of the court to have that account turned over to the Sheriff. It is the bank’s contention that the money represents trust proceeds which belong to it or to its principal, the Swiss bank. And it is with respect to this contention that the matter of waiver arises. .
The question is whether a bank, an entruster in a trust receipt transaction, can remain inert and rely entirely upon the good faith of the trustees. In essence, the bank’s position is that it can stay inactive, that since it can have no knowledge of the details of any transactions, it must rely upon the integrity of the trustee. I think it is mistaken. But for the trust receipt, the bank would have no privileged claim to the proceeds of the oil, as it had conferred upon Agro every indicia of ownership. To avoid the consequences of having done so, it must, it seems to me, take positive steps. It did nothing beyond asking for payment. When the first period for payment arrived, May 19, it asked nothing about the status of the oil, as I have said; it apparently preferred not to know. The same is true in June, when, without requesting payment, it granted a second extension. It seems to have taken the position throughout that the trustee was an ordinary purchaser with a date fixed for payment'of the.account and that it, the bank, was merely extending credit to the purchaser, extending the time for payment.
The events of June 30 confirm the bank’s attitude and position. On that day, when payment was not made, it informed the Swiss bank of that fact and stated to it that “payment date will be extended two weeks ’ ’ and asked for instructions. It failed even to inquire whether any additional oil had been sold or whether there were proceeds; or whether the payment received on June 22 represented full payment to date. The instructions it received were that there would be later ‘ * instructions for extension payment date ”, but that meantime the *505 defendant was to have the oil stored immediately in its own name. This, of course, was an impossibility as the oil had already been sold and reshipped, but even on July 2, when the bank was told that all the oil had been sold, it did not ask whether there were any accounts receivable or whether payment had been made by the buyers. On July 3, pursuant to instructions from its principal, the bank asked Agro for an assignment of the accounts receivable. On July 10 Agro informed the defendant that there were no such accounts and that the entire transaction had resulted in a loss to Agro. On the 13th the bank, apparently for the first time, learned that the deposit made in Primateria’s account on June 22 had been at the request of Primateria and that, in some manner never made clear to me, the deposit was related to the trust receipt. It was only on that day that the bank orally asked for an accounting, confirming it in a letter of July 15.
The bank’s conduct seems to me to have been a complete abandonment of its rights as an entruster, rights which it seeks to assert only after it had permitted the trustee to assume the position of a general creditor. It was singularly incurious as to what was happening to property, which it claims to have been its own and which it had entrusted to others. It was acting in fact as though it had sold the oil to Agro, using the form of a trust receipt as an invoice. It was not warranted in doing so under the statutory provisions to which it must refer (Personal Property Law, § 58-b). The bank’s right to the proceeds depends upon compliance with subdivision (c) of • that section, which entitles the bank “ To any other proceeds of the goods, documents or instruments which are identifiable, unless the provision for accounting has been waived by the entruster by words or conduct; and knowledge by the entruster of the existence of proceeds, without demand for accounting made within ten days from such knowledge, shall be deemed such a waiver.”
Obviously, knowledge of the existence of proceeds, with a readiness to let them remain with the trustee should constitute a waiver, as the statute specifically provides. Yet this is nothing more than in instance of the entruster’s avowedly looking upon itself as a general creditor without any special interest in the proceeds. ‘The same result should follow, again as the statute provides, from conduct that exhibits a similar attitude on the part of the entruster; and here, as I have said, the bank at all times seemed to regard itself as a seller interested only in obtaining payment for goods sold, so to speak, invoking the trust receipt only when disaster intervened. Indeed, both *506 entruster and the trustee ignored the terms of the trust receipt in the strict sense. As I have said, the trust receipt did not authorize sales, but it did call for payment which obviously could not be expected without sales. I do not think the defendant should be permitted to make use of the trust receipt in the manner it did.
An even stronger argument can be made for the plaintiff. By June 22, if the bank did not know it earlier, it knew that there had been some sales and some proceeds and that the sales had been made without authorization from it; yet it did not inquire into the matter at all. It seems to me that it should have inquired and that it should be held to know what it would have learned, namely, that there were additional proceeds, for which it asked no accounting. And, as I have already pointed out, when it was told on July 2 that the bulk of the oil had been shipped, it asked for no accounting, although it must have known by that time that there were proceeds. Yet, more than 10 days were to elapse before it asked for an accounting. In this respect, there was a waiver even by the passage of time alone.
The defendant relies on the fact that other trust receipts on transactions with the defendant and with other banks were paid off on their respective due dates in the period under discussion. But this merely indicates that Agro was paying its debts, not that it acted as a trustee transmitting proceeds; and the defendant could not be concerned with transactions with other entrusters. It indicates again that all that the bank was concerned with was receiving payment without reference to resale or proceeds, without reference, to the terms of the trust receipt. I excluded some testimony as to the other trust receipt transactions with the defendant, but there is enough in the record to indicate that in the case of the other two, the situation was substantially the same, automatic extensions without inquiry. The bank cannot refer to these facts in justification of its lack of diligence. It was lacking in diligence equally as to all the transactions. It was indifferent to the proceeds of the goods and must take the consequences. It remains no more than the general creditor it presumed to be.
This conclusion is confirmed by the views of the Supreme Court of Indiana. In a ease where the complaint upon a trust receipt disclosed that more than 10 days had elapsed between the sale of merchandise and the demand for payment, without any allegation as to the time when knowledge of the sale came to the plaintiff, the court held the complaint bad. There was nothing to show that the demand was made within 10 days from date of knowledge and the failure to make such a demand *507 destroyed the entruster’s lien. “ The terms of the statute ”, the court said, speaking to be sure, not strictly to the point here (the statute is similar to Personal Property Law, § 58), “ make it necessary that a constant and close scrutiny be kept on every sale or trade on the part of the dealer, [trustee] who is in a position to do harm to innocent third parties by and through the indicia of ownership placed in or permitted to come into his possession by the entruster.” (Universal Credit Co. v. Citizens State Bank, 224 Ind. 1, 7-8.) A prefatory note to the Uniform Trust Receipts Act discussing subdivision (c) of section 10 of that act (Personal Property Law, § 58-b), emphasizes the very case here, that is, the impropriety of permitting an entruster to act as a creditor while things go well but insisting on rights as an entruster when things go badly. The deposit then was Primateria’s, the bank had no special interest in it, and the Sheriff was free to attach it pursuant to the warrant of attachment.
There is a subsidiary question to be considered. The bank contends, that assuming its inability to trace the source of the bank deposit to the proceeds of the oil, the deposit by Agro in the Primateria account acted as a restoration of trust moneys. But, assuming that a waiver is not a waiver for all time and that Agro as trustee could restore funds to a trust account, the facts here do not permit any such conclusion. Instead of paying the bank, either by way of restoring trust funds or by direct payment, Agro turned the money over to Primateria by depositing the funds in Primateria’s account. There was nothing to show any intention to restore funds, Agro did not tell the bank it was so doing; it told it nothing. Indeed, it seems that the form of deposit was deliberately intended to conceal from the bank the fact that the money being deposited in any way represented proceeds from the sale of oil. Instead of having its suspicions aroused, the bank accepted the deposit to Primateria’s account and advised Primateria of that fact. There is a suggestion, but no more, from the testimony of one of Agro’s representatives who participated in the deposit of the funds to Primateria, that somehow Primateria did arrange directly with the bank in Switzerland for an extension of time, with the implication that the amount deposited to Primateria would be used toward paying off the trust receipt, but nothing of the kind was done and there is nothing to show that there was any arrangement between Primateria and the bank. Indeed, this testimony again confirms the view that I have taken as to the bank’s inertness and its disposition to act merely as a conduit transmitting messages and information from Agro to its principal and no more. The money was deposited in the *508 defendant bank, bnt the situation is no different from what it would have been if it had been deposited in some other bank in an account of Primateria’s. If that account had been attached, the defendant could not complain.
There will be judgment for the plaintiff directing the defendant to turn over to the Sheriff the amount in the attached account.